Let me say on behalf of the panel before oral argument starts and before any time is being deducted that we are very well aware of the several motions with respect to closing the courtroom. We are satisfied at the moment that there is no need to do that because the issues are legal issues. If, on the other hand, there is some urgent need to get to then, of course, that changes the dynamic and I hope counsel, all of whom are very experienced, will have sufficient presence of mind at that time to stop and make a suggestion at that point that we have to deal with this, in which case we will then take another look as to whether we should close the courtroom. Is that understood? Very good. Counsel, you may proceed. May it please the Court, Erika Frick on behalf of the United States, I would like to reserve 5 minutes of my time for rebuttal. I do so. Just watch the clock. And thank you, Your Honor, for clarifying in terms of — I do want to say on the record that, of course, I can't speak to anything covered by Rule 6e in this proceeding. And I actually would like to seek the Court's guidance as to whether the record in terms of the search warrants is unsealed for purposes of this hearing or whether I should also, in respect of the sealing order below, not be talking about facts, specific facts, about the warrants. Well, the only thing we've done is to deny the motion to seal the courtroom, period. As far as I know, that's the only action this Court has taken. So you've got it. Okay. Thank you, Your Honor. I will focus on the legal arguments. And we agree that this appeal can be resolved as a matter of law. So — All right. Well, if you get to the point, either side, if you get to the point where you feel that you need to talk about facts that are sealed, then let us know and we'll reconsider whether or not we need to clear the courtroom. Absolutely. We're not trying to hamstring your argument here. We need your help on this. I appreciate that. I will do that. Thank you. Okay. Well, as we all know, this is an appeal from three district court decisions below. We believe that two of those orders are erroneous as a matter of law under this Court's controlling precedent in Ramston, which held that even in a case where there was callous disregard of Fourth Amendment rights, that that did not justify return of all originals and copies to the movements. We believe the third order is erroneous as a matter of law because it's based on a fundamental misapprehension of the relationship between search warrants and grand jury subpoenas, and in particular that there were three aspects of the Court's decision that were erroneous. Starting with the Rule 41 issues, we first believe that the Court should not have exercised equitable jurisdiction in this case. That is, we believe, the four factors of the equitable jurisdiction case of the test that is set forth in Ramston and other Ninth Circuit cases did not weigh in favor of exercising jurisdiction here, and in particular that there was not even a cognizable injury alleged here because the government returned copies of all the evidence shortly after the searches, and because that's the only remedy that was even potentially available here, we don't believe that the Court should have As to the merits, we do believe that Ramston is controlling. It is a case where there was a warrantless search of a hotel room where there's obviously a significant privacy interest at stake, and notwithstanding that fact, the Court of Appeals held that although equitable jurisdiction was proper in that case, on the merits as a matter of law, the move-ins. We believe that controls here under any interpretation of the facts, even construing all inferences in favor of the move-ins. We do not believe that any conduct here could have possibly been worse than a warrantless search at issue in Ramston. Well, what specifically about the callous disregard finding that was made? I'm sorry. I'm not sure I understand. Well, what's your direct focus on the finding that there was callous disregard of the constitutional rights, at least of CDT? Well, we don't believe there was callous disregard because all of the searches at issue here were pursuant to valid warrants and were not the scope of the searches did not exceed those warrants. So we do not believe there was callous disregard. What about the new search warrant to search the five directories in the subdirectory? Yes. The search warrant itself actually authorized the government to do something far greater than that, which was to seize all computer evidence. And in fact, we could have taken all of the computers from the premises and searched. The warrant literally says we could have searched every single file in those computers. Well, then why did you come back for another warrant? Because the warrant already authorized. It already had a specific protocol as to the computer searches. And that sharply distinguishes this case from Tamura, which all of the district courts below misconstrued here. In Tamura, there was a wholesale seizure of large numbers of files, but the warrant hadn't authorized that seizure. Now, all that Tamura says is that if you know in advance that there's going to be evidence that you may not be able to search within the time constraints of the search, that you can specify a protocol in the warrant to allow you to take those materials off site. That is the neutral magistrate review that's contemplated in Tamura. That's exactly what the government did here. We got a warrant that says you can take the computer evidence off site and search it if you do not have time to do it on site. So we did fully comply with Tamura, and that was a, the district court decisions are based on a misunderstanding of the warrant. But then you went to a different magistrate judge for another warrant. Well, Your Honor, that April 30th was actually not necessary. The original warrants that were... Unnecessary. Now, what do you mean by that? Well, the original warrants already authorized that further search of the computer evidence. Well, doesn't this go to callous disregard, harassment? Your Honor, I would characterize it more as an honest mistake and certainly not rising to the level of callous disregard. A lot of honest mistakes in a lot of jurisdictions in this case. Actually, Your Honor, I think this was actually one of the only mistakes in this. We were required, although it's been characterized differently by the movements in the district courts, we were required to seek these warrants and to litigate these issues in the districts where we did, with the possible exception of the April 30th warrant. But in terms of evidence that's located in the central district, we have to go to the central district to search that evidence. We can't, it was not possible to resolve all of this in one proceeding. And in particular, it wasn't possible to resolve it all in front of Judge White, who only had jurisdiction over subpoenas. And he stated that himself in the record. And the movements conceded that below. I think the problem that most of the judges had is that they believed, rightly or wrongly, that the government hadn't fully disclosed what it was doing in the other jurisdictions. That seems quite evident to me. And actually, if you look at the actual search warrants, first of all, we do believe there is one factual finding of the courts below that is absolutely, clearly erroneous. And that is that the government made any misrepresentations to the judges in terms of concern about destruction of If you look at the warrants and each warrant, there is nothing in any of those warrants that says that we feared that this evidence would be destroyed. And when movements cite that in their brief, they don't cite the warrants. They cite to a later post hoc pleading that was filed in a post hoc effort to explain to the judges some of the motivations. But that's not relevant to evaluating the searches themselves and their validity under the warrants. Now, I'm sorry. I'm sorry. Ms. Frick, I would like to ask for the government's position with regard to Rule 41G. And as I read the rule, it says that the court must receive evidence on any factual issue necessary to decide the motion. Were there any evidentiary hearings conducted by any of the courts with regard to what happened before the factual findings were made? I don't believe so, Your Honor. There were hearings before Magistrate Judge Johnson held hearings before ruling in the government's favor in denying the motion for return. And we believe that decision is fairly well reasoned, but I don't believe even Judge Johnson held an evidentiary hearing. So the hearing would have been simply to receive argument of counsel and to consider the papers that had been filed in connection with the various search warrants and the timing vis-a-vis the issuance of grand jury subpoenas. That's my understanding. And is it the government's position then that that comports with Rule 41G or should the district court have done more? Well, certainly the district court should have done more in this case. I think the decisions below reflect a rather cursory analysis of the issues here. In particular, all three decisions failed to reach the merits. In the Ramston decision, it's very clear there's a separate equitable jurisdiction analysis and then there's a merits analysis, and they're very distinct. And if you look closely at the three decisions on appeal here, none of those courts reached that further merits issue. And in terms of whether there should have been more hearing to reach those issues, yes, there probably should have. I mean, here we had Cooper held no hearing whatsoever. Ilston, Judge Ilston ruled from the bench. And Judge Mahan entered the proposed order that the Movens had submitted. And none of those orders have any sort of detailed or in-depth analysis of the legal issues. In particular... Did the government ask for a hearing before any of these judicial officers? We certainly made clear to the court that we felt that I'm not sure that we made clear to Cooper. Well, you filed a motion for reconsideration because you didn't like the language that Judge Ilston used, I guess it was. But did you ask for an evidentiary hearing so that you could lay out the context in which all of this had occurred? I don't believe that we did, Your Honor. May I turn to a different subject? And that's the timeliness of the appeal from the Central District. Let me make sure I have my facts straight. The judge issued an order and you did not, the government did not file a motion for reconsideration within the time allowed by the rules. Is that right? Well, actually, Your Honor, we did file. No party received any notice of the decision until a month afterwards. And the docket was under seal. There was no way for any party to know that a decision had been issued. Right. I'm just saying you weren't within the time period. That's my first point, not why you were not within the time period. Well, if the court measures the time period. Did you file within 10 days? Everyone concedes you didn't file, parties didn't file within 10 days of the initial order. Right. Actually, I believe the time period was 30 days. Well, 30, okay. And it's true that if you go by the date that was on the court's order, as opposed to when we received notice of it, that is accurate. And then when did you file within, after you received notice of it, when did you file your motion for reconsideration? We filed, I believe we received notice on November 2nd, and we filed ours on, I believe, on November 18th. The problem I think that we have is we get, this is a little bit unusual, but we get a lot of pro se cases and other cases where everybody makes precisely the same argument that we didn't get notice and we filed as soon as we got notice. And routinely, we say you got to file within the 30 days in order to preserve, you have to be timely as to the first and as to the second. If we reach out in this case to say the government was timely, we've got a lot of other cases to deal with in which we are saying that the litigants aren't timely with their motive. Because you have to file, the motion for reconsideration, to amend or alter judgment, all those motions. And this affects death penalty cases. It affects a whole host of cases that have to be filed within that period of time in order to trigger even the right to preserve an appeal from that. Yes, I understand the question. I'm expressing a concern. I do think that in this case, that can be addressed by the fact that this is a unique situation that the docket itself was under seal. There was no way for us to have even found out by getting the docket or that sort of thing to find out that an order had been issued. Of course, not that any district court would do this, but if a court can insulate its decision by simply not giving notice, that wouldn't be a good result either. I believe that's the argument we get in a lot of cases too, is that we can't, but it's, so it's not timely. The second question I have, but there are excuses. The second question I have is, aren't we limited then on our case law to the matters presented in the motion for reconsideration as opposed to the underlying order? I think that the, first of all, the motion for reconsideration is asking for a pretty broad reconsideration of fundamental issues in the case. Well, that wasn't my question though. My question was, aren't we limited, aren't you limited to the matters presented in the motion for reconsideration, however we construe those? I'm not 100% sure of the answer to that question, or my understanding was that this is simply a tolling issue as to the amount of time, and that certainly when you file a motion for reconsideration, you're only allowed to raise certain issues that are much narrower than what you can raise on an appeal, so it doesn't, it would seem to not, to make little sense. Right, but I think you have to be timely as to both if you want to raise them. You're limited, if you're only timely as to the motion for, to amend or alter a judgment or to the motion for reconsideration, you may be limited to what you can urge on appeal. If you assume that as a hypothetical, where does that leave you in the central district case? Um, well, we still, we challenged most of the fundamental premises of that decision in our motion for reconsideration, so certainly we believe that all of those issues are in our briefs here again, but again, such a result would seem to be inconsistent with the fact that motions for reconsideration have a different purpose than an appeal, and some of the cases we set in our brief, a motion for reconsideration may be, you may be trying to clarify the record for appeal, you may be trying to deal with a specific issue before you go up on appeal, but to limit an appeal based on what you raised in motion for reconsideration would seem to unduly tie the hands of litigants. Well, that's an argument that's often made. Um, again, returning to the merits, I do believe that even if the, even if you take at face value all of the findings of the district court, of the three district courts here, that we do not have a situation where, um, the conduct was, rose to such a level that it is outside of the realm of Ramston, and I see that my time is running short, so I will reserve the rest for you. You may do so, counsel. We'll hear from the other side. Sir, I don't know if he's here and perhaps refuted it, but I've shown up at the council. Would you please identify yourself for the record? May it please the court, my name is Elliot Peters. I represent the Major League Baseball Players Association in this court, as I did below. First, addressing the issue of... One inquiry, how do you propose to share your time with Mr. Bancroft? Well, I... You have 20 minutes total, so whatever you allocate is fine. I agree that if I don't use all my time and there's something he wants to add, he will add it. If I use all the time, we're fine. Fair enough. Thank you. First, on the issue of sealing the courtroom, I do feel the need to argue the facts, because the inquiry of reasonableness under the Fourth Amendment is a fact-specific, totality-of-the-circumstances inquiry, and I do feel that in order adequately to present the case, I do need to discuss some of the factual findings made by the district courts below, based on what happened here in the execution of the search warrants. But how are those matters before the grand jury? Those are matters that occurred outside of the grand jury room. It's not a 6E issue, Your Honor. It's under the Times-Mirror case. The Times-Mirror does not say that you can't discuss a search warrant on appeal. What the Times-Mirror case says is that there's not an unfettered access to search warrants. There's a big difference. Well, then I'm happy to argue the case. I don't want to spend my time arguing the issue of sealing the courtroom. I'd really like to address it. If you could address the standing issue, I have a serious concern as to whether your client has any right to be here. And I read the Supreme Court decision in Rockus v. Illinois as saying that Rule 41 does not confer any broader standing than constitutional jurisprudence under the Fourth and Fifth Amendments. And if you can explain to me how it is that the Players Association can assert individual constitutional rights of players whose blood and urine samples are at issue here, I'm all ears. The testing results that are at issue in this case were the result of a collective bargaining agreement. Unions typically have the right to intervene under Rule 24a, and under Rule 41 is a civil case with civil equitable jurisdiction. But, Mr. Elliott, or Mr. Peters, the collective bargaining law and enforcement of rights under the National Labor Relations Act clearly recognizes that the recognized bargaining agent has standing to assert the interests of its members vis-a-vis enforcement of the provisions of the collective bargaining agreement. It seems to me that your argument has to be that, by analogy, the parties here could, in essence, contract in a collective bargaining agreement to confer constitutional derivative standing on the Players Association because it is the recognized bargaining unit. And if you've got a case that says that, I'd like to see it. But I think it's distinguishable from Rockus v. Illinois, which addresses specifically constitutional rights and the fact that they cannot be derivatively asserted by a third party. However, the expectation of privacy, which is balanced in the Rule 41 calculus, is based here on promises made in the collective bargaining agreement. And the evidence that was seized, both in Las Vegas, in San Jose, and in Southern California, would not have existed but for the promises made in the collective bargaining agreement. I think your argument is sidestepping my question. You are, in essence, arguing that a party can create a constitutional right of privacy under a collective bargaining agreement. The closest case you've got in the constitutional arena is Katz, where the guy entered the phone booth and closed the door. But in that case, the Supreme Court recognized that by the act of closing the door, Mr. Katz was trying to protect his right to a private communication, which the government eavesdropped. Here, your argument is that the collective bargaining agreement somehow creates a constitutional right of privacy in the results of these test reports, which can then be asserted in a Rule 41 motion. And I'm having a hard time making that lead. I'm not arguing, Your Honor, that the collective bargaining agreement creates the constitutional right of privacy. The constitutional right of privacy belongs to the members of the union. I'm saying that in this proceeding under Rule 24a, that the union can assert the rights of its members because privacy rights arose out of the collective bargaining agreement as to which the union is the proper representative of its members. All right. It seems to me you're arguing associational right as opposed to third party right. In other words, you bring yourself within the NAACP versus Alabama approach. Your Honor, we're asserting the rights of our members. We don't claim a separate constitutional right arising out of contract. No, I understand that. I understand that. In other words, the collective bargaining agreement allows you to assert the constitutional rights of the members covered by the CBA, just as in the NAACP case it was held that NAACP could represent the individual rights of the members of NAACP. Do I have that? That's exactly right, Your Honor. Who owns the samples and who owns the data? Who owns them? The Major League Baseball and the Major League Baseball Players Association own the samples and the data. They jointly own them under the agreement. Subject to the conditions of the agreement, right. And they were supposed to be used simply for a statistical analysis in year one and then be destroyed. Yeah, I understand that. That was the plan. And in both Nevada in the district court in Las Vegas and in the Central District of California, the government conceded that the Major League Baseball Players Association on behalf of its members had a need and standing was not raised in those courts as an issue by the government. But the parties can't confer standing by agreement. I mean, either it exists or it doesn't. So I'm not sure that the government's concession doesn't necessarily mean anything. Well, the argument, I've made the argument as well. I understand your argument. And I don't want to take up all your time on standing. There's really two issues here, which is the issue of equitable jurisdiction under Ramsden, which every court below found equitable jurisdiction, including the magistrate judge that the government seeks to rely on. All of the courts also found that the search was, the three district judges that ruled, all found that the searches were unreasonable. And they found it based on significant facts in addition to the argument presented by the government today. They found that there was, in effect, an ulterior motive, which was a phrase that this court has used in Rettig, written by now Justice Kennedy, and by Ewan, because they started out by subpoenaing all the drug testing records for Major League Baseball. Then they got a subpoena for 10, then they got a search warrant for 10, and they seized more. Another indicia is that they seized, they searched these third parties. They were not suspected of wrongdoing. CDT and Quest were not suspected of wrongdoing. They used a search warrant. But is that the test? Beg your pardon? That's not a test, is it? But you can certainly search the premises of someone who was totally innocent as long as the search warrant is specific with respect to the material that's being searched for, isn't that right? That's absolutely correct, Your Honor. But in this case, the search of a third party where there were no reasons to believe there was a possibility of destruction violated the government's own manual in when to use search warrants as opposed to subpoenas. That doesn't confer any rights on anybody, does it? I mean, doesn't the U.S. attorney's manual contain the provision that says we're not intending to create any enforceable right? It doesn't confer rights, but it's an indicia here of their ulterior motive. The totality of the circumstances... So is it in the aid of the government to use search warrants and grand jury subpoenas as simultaneous investigative tools in aid of a grand jury investigation? No, Your Honor, we're not. What I'm trying to do is go through indicia here that this search was, because it was plainly overblown. They had a very specific warrant for 10. They seized the drug testing results for thousands of people. And it's important in that... Well, stop there for a second. You concede that the warrant was proper with respect to the 10? Correct. All right. Well, the issue, I suppose, arises in the course of looking for that material, it appears that it was mixed in with a larger group. And that's... Isn't that the issue we have to deal with? It is. And it's important to directly address that issue, to understand the facts of how that happened. They – when they arrived there, they found a document which listed names and numbers, because Quest only had samples based on numbers. They took that and quite quickly started faxing out this list with hundreds of names out of CDT. Then, when they got around to – and then they found a document which had testing, but for only 26 – there were only 26 positive tests listed on that document. None of those positive tests were for the 10 individuals. And the information I'm now reciting comes from ER 294 to 297, which is the case agent's affidavit. Were there identifying numbers on that list showing negative test results for any of the original 10 who were the subject of... There were the names of some of the original 10 and negative test results... So why couldn't the government have seized those documents under the authority of the first search warrant? I mean, our case law is pretty clear that where the information is intermingled and you can't reasonably extract it, you can seize the volume, the computer hard drive, whatever it is that the relevant information is contained in, right? With respect to that document, because of the highly private information that was listed on it and the fact that there were – it was a spreadsheet with names. It wasn't like a bunch of bank transactions for one account. It was highly confidential testing results for lots of different individuals. And during the search, a request was made, follow the Temura procedures, take it to a magistrate judge or a special master so you will get the information for the 10. But let's take it to a court or a special master to decide before you seize information for test results on an intermingled document for lots of people for whom you have no probable cause. And it would have been reasonable to do that and it would have been consistent with Temura. Do you read Temura as requiring the agents to do that whenever evidence is intermingled, even when the initial search warrant authorizes them to follow the procedure that they followed, which was to seize the entire, I'll call it, realm of information and then take it back because it was just too voluminous to search on scene? Your Honor, I don't read Temura to require that. Our argument is that in this case, under the totality of the circumstances, and given the type of material that was involved and what was going on at the time, it was unreasonable of the government under the totality of the circumstances not to have done that, particularly when we turn to the other place that they found the vast majority of information of positive test results, which was on the computer, which they took with them. Now, counsel for the government says, well, we had the right to seize all the computer equipment, but the warrant which they got specifically said that a computer-trained individual, not the case agent, but a computer technician, was supposed to, in the which had been specified for seizure relating to the 10 people was on it. But what required computer IT expertise in order to look at a file folder and see whether or not it contained names or identifying numbers of the subjects of the investigation? Well, the warrant required that that was the procedure, and it made sense because the least intrusive way, if you're looking at a computer spreadsheet, for example, a government goes into a hospital. It's got a database with drug tests for hundreds and hundreds of people. They've got probable cause for one. A computer-trained personnel can find that information that they're authorized to get and give it to them without invading the privacy of the testing of the bodily fluids of thousands of other people. But my question is narrower than that. I mean, why can't – I assume this guy is just a case agent from the FBI as opposed to the IRS as opposed to a computer forensics expert. But, I mean, why couldn't the agent simply look at the content of the directory and see that the names are identifying numbers and make a determination? Why do you have to have an MBA in computer programming in order to make that? Well, in this case, because that's what the warrant said, and I – having not drafted, I can't tell you why it was drafted that way, but I think because it would be the least intrusive – to get a computer person, you could identify the least intrusive way of getting the material. But here's what they did. But it sounds like, given the intermingling of the information, they still would have – had been required to take the computers off-site. I mean, we're talking about data that would have to be extracted, and it would take hours to do that kind of work. Taking the computers off-site isn't the problem, really. It's what they did with them once they got them off-site. Well, your objection is that they didn't have – you know, have them locked in a room to which only the magistrate judge had the key, and then appoint a special master, I guess, to go in and make the decision? No. No, my objection is much more specifically as to what happened. Because what happened is – and this is at the record site that I – that I just alluded to, 294 to 297. The case agent looked through, and he went back to – and then they brought a copy up to San Jose, and they went before a different magistrate judge altogether, and they said, having looked through the information here as the case agent that's in this computer system, I see 104 other names with positive records. Well, what do we do – Mr. Peters, what do we do with the fact that the copy is now in San Jose, and the property to be searched is located in the Northern District of California, even though the original is in the Central District of California? Doesn't the Federal Rules of Criminal Procedure require them to present to a judicial officer in the Northern District of California their subsequent search warrant application for another search warrant to search that particular piece of property? The hard drive was in Los Angeles. I know that, but that's not what they wanted to search. They wanted to search the copy that was in San Jose. Now, what – That's what they told Judge Ilston, Your Honor. What they told Judge Ilston – You're not answering my question. If the property is located in the Northern District of California, doesn't the rule require that the application be made to a judicial officer here? The property was located in both districts. Well, but the search was for the property in San Jose, right? Well, they could have – they could have searched either one. And there was a magistrate judge in Los Angeles who was already receiving briefings on Rule 41 and who issued the original warrant. What case – what case requires them to go back and ask for a search warrant to search the original when they have a copy with identical data and that property is located in this district? Well, there's not a case which requires that. But here, what they did was they made a copy, they brought it up here, and then when questioned as to why they had sought the warrant here, they said, we had to because we had transported the hard drive up to the Northern District, and that wasn't true. Okay. But – and I think that that was a – was one of many factors which concerned the district courts, that they were moving around and not being candid. But I do – I want to get back to what happened with the electronic data, just so it's clear, because they get a warrant to search that hard drive on April 30th, and now the government says, well, that was unnecessary. I'm not exactly sure what that means, because they conceded, in essence, in their brief, that there was a technical, in their words, violation of the warrant, because the case agent seized and searched in some detail the information on the hard drive to find information of people other than the ten who had tested positive. And then what happened with that search? It was declared unlawful by the district court. It was declared unlawful by Judge Elston, the April 30th search warrant. It was not appealed by the government. There was a final order from the district court, which has not been appealed, deciding that the search of the Tracy directory, this computer hard drive, was unlawful. It was never appealed. What they did with that computer material was that they generated something called the B-1 list, which is a list of players who tested positive, generated mostly from that computer information which they seized on April 30th and haven't appealed. They then used that list to go ahead and execute the warrants on May 6th and get urine samples and paper drug-testing results for all of the people whose names they found on the Tracy directory. So the April 30th warrant, which they haven't appealed, rather than being unnecessary, it becomes critically important in understanding the lawfulness of all of the subsequent searches and seizures. And by not appealing it, we believe that that's just a final judgment and that there's nothing that can be done at this point about that. Let me ask you this. One of the things that's curious to me is the fact that the district judges ordered the government to return not only the original property but all copies, thereby depriving the grand jury of access even to property that you ruled. I am aware of only one area of law that permits the exclusion of otherwise relevant evidence from consideration by the grand jury, and that's under the electronic surveillance statutes where eavesdropping is shown to be illegal, and the statute provides that no use shall be made of the evidence. And I think in Ramsden we recognized that even though the martial search of the hotel room may have been unlawful, that it was improper for the district court to deny the government access to the evidence. Can you address the relief that was afforded here and why we shouldn't overturn it on the basis of Ramsden? On the basis of Ramsden, because Ramsden involved issues of foreign policy. It wasn't our government that wanted it. It was the British government that wanted it. And the court said that Ramsden's be protected in the documents by giving him copies and that the British government's interest could be addressed by returning. So you would narrow the holding in Ramsden to its facts? No. I'm sorry, Your Honor. No, that's okay. That's my question. Rule of ---- I would apply the advisory committee note to Rule 41, and I'm quoting, which says, In some circumstances, however, equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized. So we are asked, we are saying to this Court, this is that case, because we're not dealing with the kind of records we were dealing with in Ramsden. We are dealing with drug-testing results for thousands of people for whom no probable cause was ever attempted to be demonstrated, let alone presented to a magistrate judge. The authority for us to do this is the advisory committee note to a rule of criminal procedure or our generalized equity jurisdiction. It's your generalized equity jurisdiction, I think, guided by the advisory committee note to Rule 41, and I don't read Calandra. Well, you're now talking in the ---- with Calandra, now we're talking about a grand jury subpoena. We're talking about evidence that you're telling us the grand jury cannot consider under the advisory committee note and our general equitable authority. Maybe I wasn't answering the Court's question, because I'm now perceiving kind of two prongs of it. One is, under Rule 41, is a court permitted to order the return of everything? My answer to that is based on the advisory committee note. I don't read Ramsden to limit that authority under Rule 41 to return it, to return everything. I now understand the Court also to be saying, well ---- In essence, let me rephrase it. In essence, it looks to me like the district courts treated this as a pre-1989 Rule 41e proceeding where exclusion was invoked as the remedy to make whole the aggrieved party. That's how I read the import of the district court's order. Am I missing something here? I think you are, Your Honor. I think that what the district courts were saying in this case was that they were outraged by the government's conduct. They found the implications of it staggering. They felt that the government had engaged in a game of hide-the-pea. They thought that they had thrown the Fourth Amendment out the window. And under those circumstances, having found jurisdictionally, having found the Ramsden factors, having then found that the searches were unreasonable, which is the next step of the Rule 41 analysis, and then they weighed the reasons why the government claimed it was entitled to this against the privacy interests. Because the government has absolutely ---- if the government's right in this case, they could walk into a hospital. They could take positive drug testing records or any employee or employer-based drug testing program. They get probable cause for one. They take every single test result, and then they're completely immune from having to give it back. They can use it, and they can open criminal investigations on every single person who's tested positive for drugs in some kind of drug testing program, whether it's medically based or whether it's going on in the employment context. Thank you, counsel. I'll let you go three minutes over time. I appreciate that. Thank you very much. Thank you. Thank you, Mr. Peters. We'll hear from the government. There are a few points that I'd like to address. I have one question. Does the government purport to have the right to keep the sample information not only from baseball players, but also soccer players, hockey players, whatever else? Well, Your Honor, we have not claimed that on appeal, and so we have not put that at issue. I asked you the question. We're not asking for that relief. If you're asking could we have kept that material, is that what you're asking? We'll take it that way, sure. Okay. If that's the case, then assuming that the computer seizure of just the copy of the one directory was legal, which we believe it was, then yes, we were authorized specifically by the warrant to search every single file in all of their computers. We took only one directory. We were authorized to search every one of those files. And if we then found plain view evidence of criminal conduct, then yes, we were also entitled by the warrant. Yeah, but we've been talking baseball up until now. What about, I mean, this lab does testing for all kinds of sports, does it not? Well, Your Honor, it was. But again, we have not taken our position this far, and in this case, there is no need to decide that. The only items that we are asking for in this appeal are the lists which are intermingled in our information. They have not cited a single precedent that requires us to redact lists where plain view evidence is interspersed. Not to interrupt, but I will. I think I would like a response to the closing remarks of your counsel, because basically the implications of your view of plain view means that any time you go into any sort of hospital or any sort of drug testing, and there are plenty of drug testing labs throughout the United States, the government's position is, gosh, if we can get one test result, then we can look at everything else, and if it's in plain view, we're going to take that, investigate it wherever it leads. Is that the government's position? Well, and I'm glad you asked the question, because in every medical, say we're investigating a doctor who's committed Medicare fraud, in every case like that in this country, we have to go in and seize medical records of patients. There are many restrictions and regulations that apply to protect individually identifiable medical information. None of them apply in this context. All right, let's talk about drug testing, though, that wouldn't be subject to the federal laws concerning, state laws concerning hospital privacy. Let's just say it's a drug testing lab, and you say, well, I want the results for X, and they say, well, it's on a hard drive, and there are 150,000 other names on that thing. The government's position is, if it's not subject to the restrictions that we would afford the medical community, the government gets it all, and they can take that information and use it wherever it chooses to. Well, not wherever. Again, all we're seeking is these materials for investigative purposes, and again, there are many protections that protect this material in other contexts, and of course, if you ever went to trial, you'd have Fourth Amendment rights as well. Well, sure, but I mean, the whole point is, the government is suggesting that under the so-called Plain View Doctrine, that if you have a bunch of data sitting in front of you, and there's no right to redact it, that you can get confidential information, which is clearly subject to protection otherwise, for which you would have no probable cause, and you can use it for whatever purpose you choose, right? Your Honor, every time we have to seize, this happens in every health care fraud investigation in this country. Every time we have to seize a bunch of medical records, we're going to be exposed to private information of the patient. Yeah, but let me take Judge Thomas' question just from a little different standpoint. Everybody agrees there's no problem with respect to the 10 individuals. Both sides agree that. Your position is that you are allowed at least to get the 100, more or less, that are allegedly baseball players. That's right. All right, but it's more than 100. It could be as many as thousands. I'm not quite sure it's exactly clear how many we're talking about here, but there's got to be some sort of measurement or some rule that can be applied that will cabin this search. And you don't seem to suggest there's any, that you can just go in, and if it's, as Judge Thomas says, there are 50,000 names on this hard drive, you get to keep all 50,000. And you can do whatever you want with them. That does not sound right to me. Well, actually, Your Honor, that's certainly not what I meant to argue, which is, of course, we're constrained. We're constrained by the terms of the warrant. We're constrained to only use this for right now, we're only seeking to use it for investigative purpose. We're constrained by Bivens' actions. We're constrained by these health care regulations. There are all sorts of constraints. This is a very limited purpose that we're asking for this evidence for. But you're saying you're not constrained by probable cause. We are constrained by probable cause. What you're saying is, if you can use probable cause to get one test result, then, my gosh, there's Plainview and there are all these other test results just sitting there, waiting to be investigated. And we have a right to pursue that investigation. I think the difference is, you've never appealed this before, because I don't think government's ever taken the position before. Sure, you're constrained by health care, but I tell you, at least, we see redactions all the time. People produce redacted medical records, redacted testing to preserve privacy, and the government says, we want unredacted information, it's commingled, and we can use it for whatever purposes we want to, even though we don't have any reasonable suspicion of probable cause or any suspicion at all. Right? I'm not arguing with you, but it just seems to be the natural implication of your argument is fairly staggering. Well, again, Your Honor, in this case, we are only arguing about the specific baseball records that we were entitled under the warrant to seize. Now, that's the 10 or the 10 plus? It's the 100. It's the 100. Why do you want them? Why do you want them? And under clearly established Fourth Amendment principles, they have not cited any case that gives a heightened Fourth Amendment privacy interest in this context. And, again, there are many protections on individually identifiable medical information in terms of how we can use this information later. They just don't apply here when all we're seeking to do is an investigation. Counsel, we've given you extra time, as we did the other side. The case just argued will be submitted, and we shall adjourn. Thank you all. It was a very helpful argument. All rise. Thank you.
judges: O'scannlain, Thomas, Tallman